[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11400

_____

BARBARA DONALD,
as Administrator Ad Litem of the Estate
of Edward Burrell, and for the benefit of his next of kin,

Plaintiff-Appellee,

*versus*

TYLER NORRIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:17-cv-00491-JB-N

_____

Before JORDAN, NEWSOM, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal is about how to determine whether a state officer acts within his discretionary authority for purposes of qualified immunity. Edward Burrell suffered a heart attack when he was serving a sentence in jail. The Chief Deputy Sheriff and Jail Administrator, Tyler Norris, drove him to the hospital instead of calling an ambulance. To avoid paying for Burrell's medical care, Chief Norris also ordered him released from the jail before his sentence was over. Burrell died shortly after he reached the hospital. The administratrix of Burrell's estate, Barbara Donald, argues that Chief Norris's decision to release Burrell early caused a delay in medical care and, ultimately, Burrell's death. She brings a federal constitutional claim and an Alabama wrongful-death claim.

We believe Chief Norris acted within his discretionary authority when he ordered jail staff to release Burrell and drove him to the hospital. Under our caselaw, the discretionary-authority inquiry focuses exclusively on the action that caused the plaintiff's injury—here, the decision to drive Burrell to the hospital instead of calling for an ambulance. As to that action, a court must ask whether the officer had the discretionary authority to act as a general matter, not whether the officer made the correct decision in exercising his authority. Although Chief Norris may have erred when he drove Burrell to the hospital instead of calling an ambulance, that error did not violate any clearly established constitutional right. Therefore, we conclude that Chief Norris is entitled to

qualified immunity as to Burrell's federal claim and reverse the district court's denial of summary judgment on that claim.

Our resolution of this federal claim leaves a wrongful-death claim under Alabama law. The district court denied summary judgment on this claim under Alabama's jailer immunity statute. But Norris raised the defense of state immunity under section 14 of the Alabama Constitution, not statutory jailer immunity. On remand, the district court should determine whether to exercise supplemental jurisdiction over the state claim and, if so, decide whether state immunity bars the claim.

## I.

Burrell was an inmate at the Clarke County Jail serving a sixty-day sentence for a misdemeanor offense. He was sixty-two years old and had a history of hypertension and diabetes. Around 8:45 p.m. one evening, Burrell used the call button in his pod to tell the staff that he was having trouble breathing. Two officers checked Burrell's blood pressure, and it was extremely high.

Chief Norris was the Chief Deputy Sheriff and Jail Administrator for the Clarke County Jail. Near 8:55 p.m. that same evening, Chief Norris left the jail. Around 8:59 p.m., while on the road, Chief Norris got a call from the jail saying that Burrell was sweating, had high blood pressure, and was having trouble breathing. A jail nurse had told jail staff that Burrell needed to go to the emergency room immediately.

4                    Opinion of the Court                    23-11400

Chief Norris knew that "[t]he ambulance service in Clarke County had exhibited extremely slow response times in the past." The owner of the ambulance company that serviced Clarke County testified that three ambulances covered the entire county, and that his operators usually did not provide estimated response times when called. Chief Norris testified that it would ordinarily "take an ambulance twenty minutes to an hour and a half to get to the jail once they had been called." Chief Norris also believed that he "could get Mr. Burrell to the hospital and in front of a doctor and a team of nurses within seven or eight minutes." So he decided to transport Burrell to the hospital himself, turned around, and headed for the jail.

On his way to the jail, Chief Norris instructed another officer to release Burrell on "time served." According to Chief Norris, the sheriff directed Chief Norris to release Burrell. But Chief Norris also admitted that he knew releasing Burrell meant that Burrell, and not Clarke County, would be responsible for the hospital bill.

While Chief Norris was on his way to the jail, the jail staff ordered Burrell to change into his street clothes. Burrell changed, walked down the jail hallway, and met Chief Norris in the jail's sallyport around 9:06 p.m. Burrell got into the front seat of Chief Norris's vehicle, and they sped toward the hospital. Chief Norris "talked to [Burrell] the whole time" on their way to the hospital "just to keep him verbal and keep him talking." Burrell said that he was hot and Chief Norris rolled down his windows for better

airflow. Chief Norris also turned on his emergency lights and sirens to get to the hospital as quickly as possible.

Chief Norris and Burrell arrived at the hospital around 9:10 p.m.—about eleven minutes after Chief Norris first learned that Burrell was in distress and four minutes after Chief Norris picked up Burrell at the jail. Someone at the hospital had told Officer Hinson that Burrell should be brought "through the lobby . . . to be seen like the rest of the patients there." But Chief Norris understood that there was no time "to take [Burrell] into the lobby and sit down and fill out paperwork." So Chief Norris pulled up "to the emergency room door," entered a passcode, and opened the door himself. He "hollered for the nurse to bring [him] a wheelchair" and told her that Burrell was having a heart attack.

Burrell got out of Chief Norris's vehicle and into the wheelchair with some assistance. But as the nurse wheeled Burrell toward the emergency room, Burrell went limp, his head fell back, and he began to foam at the mouth. Hospital personnel attempted to resuscitate Burrell for nearly an hour before pronouncing him dead.

Barbara Donald—the administratrix of Burrell's estate—sued Chief Norris on two causes of action: a claim under 42 U.S.C. § 1983, which alleged that Chief Norris was deliberately indifferent to Burrell's medical needs in violation of the Eighth Amendment, and a tort claim for wrongful death under Alabama law. Chief Norris moved for summary judgment on both claims, asserting a defense of qualified immunity against the section 1983 claim and a

defense of state immunity against the wrongful-death claim. In her opposition to summary judgment, Donald supplied a report and testimony from an expert witness—Dr. Sonja Harris-Haywood. Dr. Harris-Haywood's report stated that Burrell's act of "changing clothes, walking, [and] climbing into a passenger . . . seat . . . . most likely exacerbated his symptoms and increase[d] the probab[ilit]y of a negative outcome, including death." And Dr. Harris-Haywood testified that Chief Norris erred by taking Burrell to the hospital himself instead of calling 911.

The district court held that Chief Norris was not entitled to qualified immunity because he was not acting within the scope of his discretionary authority. The district court concluded that Chief Norris acted outside his discretionary authority when he ordered Burrell's release from custody. The district court also determined that a reasonable jury could find that Chief Norris's actions violated Burrell's constitutional rights. The district court did not address whether Chief Norris's actions violated clearly established law.

Similarly, the district court denied Chief Norris's motion for summary judgment on Donald's wrongful-death claim. The district court cited the Alabama Jailer Liability Protection Act and concluded that Chief Norris "was not acting in the line and scope of his duties or in compliance with the law when he ordered . . . Burrell be released from the jail on the basis of 'time served.'" The district court did not expressly decide the question of state immunity.

Chief Norris appealed.

## II.

"[W]e have interlocutory jurisdiction over legal issues that are the basis for a denial of summary judgment on qualified immunity grounds." *Cottrell v. Caldwell*, 85 F.3d 1480, 1484 (11th Cir. 1996). Likewise, we have interlocutory jurisdiction over "the denial of summary judgment based on sovereign immunity." *Tinney v. Shores*, 77 F.3d 378, 383 (11th Cir. 1996). And "[w]e review *de novo* whether [an] officer[] [is] entitled to summary judgment based on immunity." *English v. City of Gainesville*, 75 F.4th 1151, 1155 (11th Cir. 2023).

## III.

Donald brings a federal claim and a state claim against Chief Norris. The federal claim is a claim of deliberate indifference under the Eighth Amendment, against which Chief Norris asserts a defense of qualified immunity. The state claim is a claim of wrongful death under Alabama law, against which Chief Norris asserts a defense of state immunity. We address each claim separately, beginning with the federal claim.

### A.

Donald's federal claim arises under section 1983, which provides a cause of action for damages against anyone who violates the plaintiff's federal rights under color of state law. *See* 42 U.S.C. § 1983. For its part, "[q]ualified immunity protects government officials performing discretionary functions from liability [under section 1983] if their conduct violates no clearly established statutory

or constitutional rights of which a reasonable person would have known." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1343–44 (11th Cir. 2016) (cleaned up) (quoting *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996)). "The purpose of qualified immunity is to protect officials from the chilling effect that a fear of personal liability would create in carrying out their discretionary duties." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). To that end, qualified immunity "protect[s] from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

We use a burden-shifting analysis to determine whether an officer is entitled to qualified immunity. *Brooks v. Miller*, 78 F.4th 1267, 1280 (11th Cir. 2023). First, the officer "must show that he was acting within the scope of his discretionary authority when he committed the challenged acts." *Id.* If the officer establishes that he was acting within the scope of his discretionary authority, the burden then shifts to the plaintiff. *Id.* To overcome the qualified-immunity defense, the plaintiff must establish that "(1) the defendant violated a constitutional right, and (2) that constitutional right was 'clearly established' at the time of the defendant's actions." *Id.* (quoting *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022)). We address each issue in turn.

1.

We will start with the question of discretionary authority. "A government official acts within his discretionary authority if his actions were (1) undertaken pursuant to the performance of his

duties and (2) within the scope of his authority." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017). Put another way, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

Although all agree that Chief Norris was responsible for providing medical care to the inmates in his jail, Donald argues that Chief Norris exceeded his discretionary authority when he formally released Burrell before driving him to the hospital. Specifically, Donald argues that Chief Norris had no authority to release Burrell because he had not yet served his full criminal sentence. Donald asserts that only judges, not jailers, can set an inmate's sentence length. Because the authority to discharge a criminal sentence early does not belong to sheriffs or sheriffs' deputies, Donald contends that Chief Norris lacked discretionary authority and cannot benefit from qualified immunity.

We disagree. Donald's focus on whether Chief Norris had authority to order Burrell's early release is inconsistent with our precedents in two ways.

First, Donald's argument assesses discretionary authority far too narrowly. When we assess whether an officer acted within his discretionary authority, "we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under

constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266. We do not ask "whether it was within the defendant's authority to commit the allegedly illegal act"—for that is "an untenable tautology." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998) (cleaned up). Instead, we "must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (quoting *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997)). So when addressing the discretionary authority question, courts should ask whether the decision the official faced produced choices of action that were within the "arsenal of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267 (cleaned up).

In light of the general nature of the inquiry, Donald's narrow focus on Chief Norris's legal authority to formally release an inmate misses the mark. There is no question that Chief Norris had a "duty to operate the jail and supervise the inmates housed therein for whose acts he . . . is civilly responsible." Ala. Code § 14-6-1. And this duty includes the process of booking and releasing inmates. *Murey v. City of Chickasaw*, 385 So. 3d 903, 915 n.2 (Ala. 2023). The right question to ask for purposes of discretionary authority is whether Chief Norris acted within that general arsenal of powers, not whether he made the right choice. If Chief Norris's course of action was reasonably related to, or within the "outer perimeter" of his powers, then his action was within his discretionary authority. *See Harbert Int'l*, 157 F.3d at 1282.

Donald says that her narrow focus finds support in *Estate of Cummings v. Davenport*, 906 F.3d 934 (11th Cir. 2018). But we disagree. There, we reasoned that, although a sheriff had the authority to make decisions about an inmate's medical care, he did not have discretionary authority to make end-of-life decisions, such as entering a do-not-resuscitate order or ordering the withdrawal of artificial life support. *Id.* at 941. We explained that the Alabama Natural Death Act "establishe[d] a comprehensive legislative scheme for end-of-life medical decisions," and that scheme did not give a jailer the authority to make end-of-life decisions for an inmate. *Id.* In other words, the Alabama Natural Death Act removed the end-of-life decision from the sheriff all together; he lacked discretionary authority to make any choice on behalf of the inmate—whether right or wrong. *See id.* But, unlike *Cummings*, there is no Alabama statute that defines who has the exclusive authority to release an inmate from jail. And we do not read *Cummings* to create a special rule that would shrink the focus of the discretionary-authority inquiry when a sheriff or sheriff's deputy is faced with a medical emergency.

Second, in addition to being too narrow, Donald's argument that Chief Norris had no authority to formally release Burrell "focuses on the wrong conduct." *Mikko*, 857 F.3d at 1144. The Supreme Court has rejected the idea that a "defendant official's violation of a clear statute or regulation, although not itself the basis of suit, should deprive the official of qualified immunity." *Davis v. Scherer*, 468 U.S. 183, 193 (1984). Accordingly, we must keep in mind that "only the conduct that caused the plaintiff's alleged

constitutional injury is relevant to the discretionary authority inquiry." *Mikko*, 857 F.3d at 1144 (cleaned up) (quoting *Harbert Int'l*, 157 F.3d at 1283).

Donald's theory is that Chief Norris subjected Burrell to cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits government officials from "exhibiting 'deliberate indifference to the serious medical needs of prisoners.'" *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (cleaned up) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). So, in a case like this one, a plaintiff must establish that an officer's deliberate indifference caused his injury. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1584 (11th Cir. 1995). That is, "the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred." *Jackson v. Sauls*, 206 F.3d 1156, 1168 n.16 (11th Cir. 2000).

Turning to the specifics of this case, we cannot see how Chief Norris's decision to formally release Donald caused his alleged constitutional injury. Donald does not argue that Chief Norris inflicted cruel and unusual punishment by the act of releasing Burrell from jail too early—that would, after all, be a very odd cruel and unusual *punishment* claim. Instead, the gravamen of Donald's deliberate indifference claim is that Chief Norris delayed Burrell's medical care by driving him to the hospital instead of calling an ambulance. For example, Donald's complaint alleges that "[t]he physical exertion [Chief] Norris forced upon [Burrell] and his

failure to engage EMS . . . caused and/or contributed to the un-timely wrongful death of [Burrell]." Donald's expert testified that, if Chief Norris would have called 911 instead of driving Burrell to the hospital, Chief Norris would have "increased [Burrell's] risk of survival." Likewise, Donald's brief argues that Chief Norris knew that "releasing Burrell, failing to call 911, and personally transport-ing Burrell to the hospital would increase the risk of his condition worsening."

This claim does not turn on Chief Norris's decision to for-mally release Burrell before his transfer to the hospital. If we con-sider the scenario where all the facts remained the same, except that Chief Norris never instructed the jail staff to formally release Burrell from his sentence, nothing changes. Donald suggests that the decision to formally release Burrell caused his exertion and led to Chief Norris transporting Burrell to the hospital himself instead of calling an ambulance. But Donald has produced no evidence that Chief Norris's choice to release Burrell required Burrell's exertion or Chief Norris to transport Burrell. Chief Norris could have re-leased Burrell and still called for an ambulance. Conversely, Chief Norris could have ordered Burrell to walk down the jail hallway without ever formally releasing him. The formal release itself does not change the analysis.

Because we must focus on the general nature of the act that allegedly violated the Constitution and caused Burrell's injuries, we conclude that Chief Norris is being sued for acts within his dis-cretionary authority. Alabama law requires county sheriffs to

provide inmates with "necessary medicine and medical attention." Ala. Code § 14-6-19(2). And we have recognized that "decision-making related to the provision of medical care for inmates falls soundly within prison officials' discretion." *Est. of Cummings*, 906 F.3d at 941 (cleaned up). Here, Chief Norris faced the decision of how to transport a seriously ill inmate to the hospital, and he responded by processing Burrell out of the jail and driving Burrell to the hospital instead of leaving Burrell in the jail and calling an ambulance. Whether Chief Norris made the right decision or the wrong decision in response to this medical emergency, his decision fell squarely within his duties as a jail administrator.

2.

Now that we have established that Chief Norris was acting within his discretionary authority, we must determine whether he violated a clearly established constitutional right. *See Brooks*, 78 F.4th at 1280. Donald argues that Chief Norris violated Burrell's rights under the Eighth Amendment. Even assuming a constitutional violation, we cannot agree that Chief Norris violated a clearly established right.

We recently clarified "the standard for establishing liability on an Eighth Amendment deliberate-indifference claim." *Wade*, 106 F.4th at 1261–62. "First, of course, the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious." *Id.* at 1262 (cleaned up) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). And "[s]econd, the plaintiff must demonstrate that the defendant acted

with subjective recklessness as used in the criminal law." *Id.* (cleaned up) (quoting *Farmer*, 511 U.S. at 839). That standard means that the plaintiff must establish "that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Id.* But "even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable under the Cruel and Unusual Punishments Clause if he responded reasonably to the risk." *Id.* (cleaned up) (quoting *Farmer*, 511 U.S. at 844–45).

We need address only whether Burrell's right to some other treatment was clearly established because that answer resolves the qualified-immunity question. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up) (quoting *al-Kidd*, 563 U.S. at 741). Plaintiffs can prove that the law was clearly established in three ways. *Wilson v. Sec'y, Dep't of Corr.*, 54 F.4th 652, 661 (11th Cir. 2022). One way is to "point[ ] to a materially similar case decided by the Supreme Court, the Eleventh Circuit, or the [Alabama] Supreme Court that clearly establishes the statutory right." *Id.* (cleaned up). Another is to establish that "a broad statement of principle within the Constitution, statute, or case law clearly establishes the constitutional right." *Id.* (cleaned up) (quoting *Hill v. Cundiff*, 797 F.3d 948, 979 (11th Cir. 2015). And third, a plaintiff may prove "that the defendants engaged in conduct so egregious that a constitutional right was clearly violated,

even in the total absence of case law." *Id.* (cleaned up) (quoting *Hill*, 797 F.3d at 979).

To assess whether previous cases clearly establish the law "under the 'materially similar' inquiry, we ask whether the factual scenario that the official faced is 'fairly distinguishable from the circumstances facing a government official' in a previous case." *Terrell v. Smith*, 668 F.3d 1244, 1256 (11th Cir. 2012) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1352 (11th Cir. 2002)). If the facts are distinguishable, "the cases are not materially similar and, thus, provide insufficient notice to the official to clearly establish the law." *Terrell*, 668 F.3d at 1256.

Donald cannot point to any materially similar precedent that clearly establishes a violation of his constitutional rights "under similar circumstances." *Wesby*, 583 U.S. at 65 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). Donald cites some of our decisions that say "[l]ack of funds . . . cannot justify an unconstitutional lack of competent medical care or treatment of inmates." *Anderson v. City of Atlanta*, 778 F.2d 678, 688 n.14 (11th Cir. 1985); *see also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) (same); Donald also points us to our precedents holding that "if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." *Ancata*, 769 F.2d at 704; *see also Johnson v. Lewis*, 83 F.4th 1319, 1328 (11th Cir. 2023).

Those decisions are distinguishable because none of them contemplate officers that "responded reasonably to the risk." *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 844–45). The officers

in *Anderson* provided no medical treatment at all after a detainee told them that he was overdosing on pills and needed to go to the hospital. *Anderson*, 778 F.2d at 680–81. Likewise, in *Ancata*, the plaintiff alleged that prison employees (1) failed to provide care they subjectively believed was necessary, (2) intentionally failed to provide care because the inmate couldn't pay for it, and (3) provided cursory medical treatment for a serious medical condition. *See Ancata*, 769 F.2d at 703–04. And in *Johnson*, doctors failed to provide an inmate with prescription medication for over five years. *See* 83 F.4th at 1324. But Donald has cited nothing that would put Chief Norris on notice that his decision to drive Burrell to the hospital in his own vehicle rather than call an ambulance was an unreasonable response to Burrell's medical emergency.

Likewise, there is no broad statement of principle—unrelated to a set of particularized facts—that clearly establishes the unconstitutionality of Norris's actions. "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 845. And, of course, "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (discussing use of force). No broad principle suggests that Chief Norris acted unreasonably under the specific facts and circumstances of this case.

Donald cites one of our decisions for the proposition that "[a] finding of deliberate indifference necessarily precludes a

finding of qualified immunity [because] prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994) (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992), *overruled in part on other grounds as recognized in Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012)), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)). But that argument falls short because we later expressly rejected the statement Donald relies on from *Hill* because it "incorrectly jumble[d] the merits of an Eighth Amendment violation with the separate concept of an immunity defense." *Marsh v. Butler County*, 268 F.3d 1014, 1030 n.8 (11th Cir. 2001) (en banc), *abrogated in part by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561–63 (2007). Indeed, the formulation from the *Hill* dicta would eliminate the "clearly established" part of the qualified-immunity analysis as we know it.

Finally, we cannot say that Chief Norris's conduct was so egregious that it obviously violated the Constitution. With the benefit of hindsight, we can criticize his decision making: Chief Norris could have called 911 first to check if an ambulance was nearby, or he could have reduced Burrell's exertion by ordering him to stay in his jail clothes or be carried by guards through the hallway. But that sort of cool, deliberative, Monday-morning-quarterbacking is exactly what qualified immunity protects against. Officers like Chief Norris "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Here, Chief Norris and

Burrell arrived at the emergency room only eleven minutes after jail personnel determined that Burrell needed to go to the hospital. Chief Norris also identified reasonable—even if, perhaps, medically erroneous—reasons for believing that it was better to drive Burrell than wait on an ambulance. Chief Norris's actions were not so unreasonable in the light of the circumstances that he obviously violated Donald's constitutional rights.

B.

We turn now to Donald's claim of wrongful death under Alabama law. Chief Norris moved for summary judgment on the basis of state immunity, and the district court denied Chief Norris's motion. But Chief Norris argues—and Donald does not dispute—that the district court conflated state immunity with immunity under the Alabama Jailer Liability Protection Act.

Under Alabama law, state immunity is not coextensive with the Jailer Liability Protection Act. State immunity comes from the Alabama Constitution, which provides "[t]hat the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. art. I, § 14. The Supreme Court of Alabama has previously held that state immunity bars individual-capacity claims against sheriffs. *Parker v. Amerson*, 519 So. 2d 442, 446 (Ala. 1987). And because "deputy sheriffs are immune from suit to the same extent as sheriffs[,]" the Supreme Court of Alabama has extended state immunity to deputy sheriffs as well. *Alexander v. Hatfield*, 652 So. 2d 1142, 1144 (Ala. 1994). That extension includes deputy sheriffs who act as a warden or as jailers. *Ex parte Burnell*, 90 So. 3d 708, 715 (Ala.

2012). By contrast, the Supreme Court of Alabama has held that state immunity does not extend to non-deputy jailers. *Ex parte Shelley*, 53 So. 3d 887, 897–98 (Ala. 2009). In response to the court's decision in *Shelley*, the Alabama "Legislature enacted the Jailer Liability Protection Act," which provides immunity to non-deputy jailers under certain circumstances. *Johnson v. Conner*, 754 F.3d 918, 920 (11th Cir. 2014).

The district court treated these immunities alike, but they are not. For instance, to be eligible for immunity under the Jailer Liability Protection Act, the officer must "act[ ] in compliance with the law." Ala. Code § 14-6-1. State immunity—at least as previously applied to sheriffs and their deputies—carries no similar requirement. *See, e.g.*, *Poiroux v. Rich*, 150 So. 3d 1027, 1038 (Ala. 2014) ("Suits against [sheriffs] for actions taken in the line and scope of their employment inherently constitute actions against the State, and such actions are prohibited by § 14.") (quoting *Ex parte Donaldson*, 80 So. 3d 895, 898 (Ala. 2011) (quotations omitted)). Because Chief Norris is a deputy sheriff who was acting as a jail administrator, state immunity—not jailer immunity—governs the analysis. *See Burnell*, 90 So. 3d at 715. And Norris told the district court that he claimed state immunity, not statutory immunity under the Jailer Liability Protection Act, in his summary judgment briefing. The heading of the relevant section of Norris's summary judgment brief is titled "PLAINTIFF'S WRONGFUL DEATH CLAIM IS BARRED BY STATE IMMUNITY." And the brief cites section 14 of the Alabama Constitution.

Because the district court applied the wrong legal standard, the district court did not consider the parties' arguments about the application of state immunity. We note that district judges are divided on whether and how state immunity applies to sheriffs and their deputies under Alabama law. *Compare Reynolds v. Calhoun*, 650 F. Supp. 3d 1272, 1276 (M.D. Ala. 2023) *with King v. Moon*, 697 F. Supp. 3d 1273, 1279–80 (N.D. Ala. 2023). The parties also argue that, regardless of the standard, the facts here support their respective positions. But we are "a court of review, not a court of first view." *Callahan v. United States Dep't of Health & Hum. Servs. through Alex Azar II*, 939 F.3d 1251, 1266 (11th Cir. 2019). And we cannot definitively resolve questions of state law in any event. Accordingly, we vacate the district court's order denying summary judgment and remand for the district court to determine whether to exercise supplemental jurisdiction over this claim and, if so, whether to grant or deny summary judgment under state immunity.

## IV.

We **REVERSE** the district court's denial of qualified immunity and **REMAND** with instructions to enter summary judgment for Chief Norris on the federal claim. On Donald's state claim, we **VACATE** the district court's denial of immunity and **REMAND** with instructions for the district court to determine whether to exercise supplemental jurisdiction over this claim and, if so, whether to grant or deny summary judgment under state immunity.

1                    JORDAN, J., Dissenting                    23-11400

JORDAN, Circuit Judge, Dissenting.

The qualified immunity issues in this case are difficult, and the majority provides a plausible rationale for its decision. In my view, however, the district court correctly ruled that Chief Norris did not carry his burden of showing that he was exercising discretionary authority. As a result, I do not believe he is entitled to qualified immunity and respectfully dissent.

\* \* \* \* \*

The discretionary authority prong of qualified immunity asks whether the official being sued acted "in the regular course of discharging his official duties." *Cruz v. Beto*, 603 F.2d 1178, 1183 (5th Cir. 1979). In other words, was the official performing a legitimate job-related function "through means that were within his power to utilize[?]" *Holloman ex rel Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

Chief Norris, as the official being sued under 42 U.S.C. § 1983, bears the burden of establishing the discretionary authority prong. *See Cruz*, 603 F.2d at 1181. *See also Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (explaining that an official claiming qualified immunity must "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred'") (citation omitted). He has to "demonstrate objective circumstances which would *compel the conclusion* that his actions were undertaken pursuant to the performance of his duties and within

23-11400                JORDAN, J., Dissenting                    2

the scope of his authority." *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir. Unit A July 30, 1981) (emphasis added).

Where a plaintiff claims that the official "engaged in a myriad of unlawful and improper conduct, only the conduct that caused [the] alleged constitutional injury is relevant to the discretionary authority inquiry." *Harbert Int'l, Inc. v. Jones*, 157 F.3d 1271, 1283 (11th Cir. 1998). But it is not unusual for an injury to have multiple but-for and proximate causes. *See Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) ("Often, events have multiple but-for causes."); *Staub v. Proctor Hospital*, 562 U.S. 411, 420 (2011) ("[I]t is common for injuries to have multiple proximate causes."); *Thomas v. Broward County Sheriff's Office*, 71 F.4th 1305, 1313 (11th Cir. 2023) (concluding that discrimination against an employee could have had multiple proximate causes).

In her deliberate indifference claim, Ms. Donald challenges two interrelated decisions made by Chief Norris. The first is his decision to have his subordinates release Mr. Burrell from custody while he was still serving a valid sentence of imprisonment. The second is his decision to take Mr. Burrell to the hospital himself rather than call for an ambulance. Although Mr. Burrell's death is temporally closer to the decision of Chief Norris to serve as the personal transport to the hospital, he needed Mr. Burrell to be out of custody so that the county would not be on the hook for the medical expenses. Significantly, there is evidence in the record from Dr. Harris-Haywood that Chief Norris exacerbated Mr. Burrell's symptoms and increased the probability of death in

effectuating the release, by requiring him to walk 100 feet, change into his street clothes without a chair on which to sit, and climb into the passenger seat of the car. At least one of these things—having Mr. Burrell change into his street clothes without a chair on which to sit—was independent of Chief Norris taking Mr. Burrell to the hospital. After all, Chief Norris could have transported Mr. Burrell to the hospital while he was dressed in his prison attire. I therefore think that the majority is mistaken in believing that Chief Norris' decision to release Mr. Burrell, before taking him to the hospital, is entirely irrelevant to the discretionary authority analysis.

We are at the summary judgment stage, and for qualified immunity purposes the evidence has to be viewed in the light most favorable to Ms. Donald. *See Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). Insofar as proximate cause is concerned, a reasonable jury could find that both the decision to transport Mr. Burrell to the hospital without calling an ambulance and the decision to release him from custody were substantial factors (i.e., but-for and proximate causes) in Mr. Burrell's death. *See Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000) ("For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue."). For me, then, Chief Norris has to show that both challenged decisions were exercises of discretionary authority. If he cannot do so, he is not entitled to qualified immunity.

⋆ ⋆ ⋆ ⋆ ⋆

Under the discretionary authority prong of the qualified immunity analysis the question is not whether the official in question acted properly (i.e., legally) but rather whether the actions were an authorized part of the job: "[W]e look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017) (citation and internal quotation marks omitted). "[W]e consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint." *Holloman*, 370 F.3d at 1266.

In *Estate of Cummings v. Davenport*, 906 F.3d 934 (11th Cir. 2018), we explained in great detail what it means to look at the "general nature" of the official's action. In *Davenport* the estate of a deceased inmate (Cummings) in part asserted a § 1983 deliberate indifference claim against an Alabama prison warden (Davenport). The inmate had been stabbed by another inmate and taken to a hospital, where he was listed in critical condition. *See id.* at 937. The estate alleged that the warden had told the hospital authorities to not take any heroic measures to save the inmate's life. *See id.* at 938. The warden also allegedly instructed the hospital authorities to stop giving the inmate medication and to disconnect him from a life-support machine even though his mother wanted him to stay on life support because he was breathing and responding to verbal

commands.  *See id.*  The district court denied the warden's motion to dismiss the deliberate indifference claim on qualified immunity grounds, ruling that the warden had failed to show that he exercised discretionary authority in making end-of-life decisions for the inmate.  *See id.* at 938–39.

We affirmed the district court's denial of qualified immunity.  We held that the "Alabama Natural Death Act, Ala. Code § 22-8A-1 *et seq.*, compels the conclusion that the office of a prison warden grants no authority to enter a do-not-resuscitate order or to order the withdrawal of artificial life support on behalf of a dying inmate." *Id.* at 941.  Although Alabama law gave a prison warden the right to make medical decisions for inmates in his custody, we did not find discretionary authority for end-of-life decisions based on that general power.  Instead, we examined the hierarchy of persons under the Act who could make end-of-life decisions for permanently incapacitated individuals without a living will or a designated a health-care proxy, and concluded that the warden was not one of those persons because the inmate had not designated him as a surrogate.  Our reasoning bears quoting at length:

> The Act establishes that Davenport lacked the discretionary authority to instruct the [hospital authorities] to enter a do-not-resuscitate order for Cummings or to withdraw his artificial life support. Under the Act, only an authorized surrogate can consent to a do-not-resuscitate order, or "determine whether to provide, withdraw, or withhold life-sustaining treatment or artificially provided nutrition and hydration[.]" Nothing in the Act empowered Davenport, as a prison warden,

> to act as the surrogate of a dying inmate. Davenport
> could outrank Cummings's relatives in the hierarchy
> of priority—or figure in the hierarchy at all—only if
> a court appointed him Cummings's guardian and
> "specifically authorize[d] [him] to make decisions re-
> garding the withholding of life-sustaining treatment
> or artificially provided nutrition and hydra-
> tion[.]" And Davenport has never suggested that he
> received such an appointment.

*Id.* at 941 (statutory citations omitted).  We acknowledged the "firmly established legal principles" that a warden in Alabama has "legal custody" of inmates and is responsible for the provision of medical care to them, but turned aside the argument that these principles gave the warden the authority to make end-of-life decisions for the inmate:  "We have no quarrel with these firmly established legal principles. But they do not compel the conclusion that an Alabama warden has the authority to enter a do-not-resuscitate order or to consent to the withdrawal of artificial life support on behalf of a dying inmate. And the Act makes clear that an Alabama warden does not in fact have that authority."  *Id.* at 941–42 (citation and internal quotation marks omitted and punctuation altered).

Finally, we explained that the "principle that we 'look to the general nature of the defendant's action' to determine whether an official was acting within his discretionary authority does not change our conclusion." *Id.* at 942.  Although the warden argued that he was "entitled to qualified immunity because he had some general authority to make medical decisions for inmates," his

argument "misunderst[ood] our precedents." *Id.* "The reason we take care not to 'assess the defendant's act at too high a level of generality,'" we said, "is not to give officials additional slack; it is to avoid the 'tautology' of asking whether a defendant had the authority to violate the law[.] What we strip away from the defendant's allegedly unconstitutional action to isolate its 'general nature' is nothing more than its alleged unconstitutionality: 'that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.'" *Id.* (citations omitted).

*Davenport* teaches that, in assessing discretionary authority, we look at the *specific* action that the official took while stripping away only its alleged illegality. *Davenport*, moreover, is not an outlier. Consider *Barker*, decided by the former Fifth Circuit more than 40 years ago. In that case, a police officer was sued under § 1983 for retaining allegedly stolen property when it was apparent that the property was not going to be used as evidence against the person who demanded its return. *See* 651 F.2d at 1131. Even though a law enforcement official is generally allowed to seize and hold property believed to be stolen, and even though the police officer in question argued that he was justified in keeping the property because he "believe[d] it to have been stolen," we ruled that he had not shown that he was exercising discretionary authority. *See id.* He "established no objective circumstances from which one could conclude that his retention of the property was undertaken pursuant to the performance of his duties and within the scope of his authority." *Id.* at 1131–32. As a result, he "ha[d] not established

his entitlement to claim official immunity from liability for this cause of action[.]" *Id.* at 1132.

*Barker*, like *Davenport*, looked at the official's authority to take the specific action complained of (i.e., the authority to retain private property that was not going to be used as evidence and was demanded by its owner) and not the action at its greatest level of generality (i.e., the authority to retain private property believed to be stolen). Here we must assess chief Norris' specific action—releasing Mr. Burrell from custody, while he was serving a valid sentence, without a court order.

★ ★ ★ ★ ★

"We look to state law to determine the scope of a state official's discretionary authority[.]" *Davenport*, 906 F.3d at 940. Alabama law generally provides that a sheriff "has the legal custody and charge of the jail in his or her county and all prisoners committed thereto, except in cases otherwise provided by law." Ala. Code § 14-6-1. But there is nothing in § 14-6-1 that authorizes or allows a sheriff, without a court order, to release a prisoner who is serving a valid custodial sentence. Indeed, the Alabama Supreme Court has said that a sheriff operating a county jail must "keep[ ] the prisoners safely *until of their custody he is relieved by legal authority*," *Shields v. State*, 16 So. 85, 86 (Ala. 1894) (emphasis added), and Chief Norris has not pointed to anything in Alabama law that gave him the authority to order Mr. Burrell's release from lawful custody without a court order.

9                    JORDAN, J., Dissenting                    23-11400

The majority says that, unlike the situation in *Davenport*, there is no Alabama statute that defines who has the exclusive authority to release an inmate from jail. But that is too crabbed a view of the explanatory and expansive language in *Davenport*. In any event, the Alabama statute that sets out the general duties of sheriffs does not include the authority to release inmates, without a court order, while they are serving lawful sentences. *See* Ala. Code § 36-22-3. To the contrary, that statute provides that sheriffs are to "obey the lawful orders and directions of [circuit, district, and probate] courts," § 36-22-3(a)(2), and one would think that this command includes lawful sentences imposed in criminal cases. Moreover, another Alabama statute—this one concerning sheriffs and inmates—strongly suggests that the release date of an inmate is not for the sheriff to decide. *See* Ala. Code § 36-22-8 ("The sheriff must keep, in his office and subject to the inspection of the public during office hours, a well-bound book, to be procured at the expense of the county, in which he must enter a description of each prisoner received into the county jail, showing the name, age, sex, color and any other distinguishing marks, together with the charge for which such prisoner is held, the order and date of commitment *and the order and date of release*.") (emphasis added). *See also* Ala. Code § 14-6-15 ("[W]hen a prisoner is discharged from, or otherwise leaves such jail, the sheriff shall report to such clerk, within two days next succeeding, the name of such prisoner and *by what authority* and when *he so left or was discharged*.") (emphases added).

Again, Chief Norris bears the burden on the discretionary authority prong of qualified immunity. The little that he has

23-11400                JORDAN, J., Dissenting                    10

presented does not "compel the conclusion," *Barker*, 651 F.2d at 1121, that he was exercising discretionary authority when he decided to release Mr. Burrell from custody, without a court order, so that he could personally transport him to the hospital.

★ ★ ★ ★ ★

I don't know whether Ms. Donald will be able to prevail on her deliberate indifference claim for the death of Mr. Burrell. But I believe that Chief Norris is not entitled to qualified immunity on that claim. I respectfully dissent.